United States Courts
Southern District of Texas
FILED

JUN 0 3 2015

David J. Bradley, Clerk of ...

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | Criminal No. |
| v. | § § | UNDER SEAL |
| **OAKEY CHIKERE** | § § § § | |
| Defendant | § § | 15 CR 303 |

15 CR

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order.

### INDICTMENT

The Grand Jury charges:

#### General Allegations

At all times material to this Indictment, unless otherwise specified:

#### The Medicare Program

1. The Medicare program (Medicare) was a federally-funded health care program designed to provide medical care to individuals over age 65 and individuals with disabilities. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the U.S. Department of Health and Human Services ("HHS"). Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2. Medicare consisted of four main parts, Part A (Hospital), Part B (Physician/Outpatient Services), Part C (Medicare Advantage Plans) and Part D (Prescription Drug). Medicare Part B was a voluntary insurance program financed by premiums paid by enrollees and funds appropriated by the Federal government via payroll taxes. Medicare Part A included Home Health services provided by licensed medical professionals at a patient's residence and are paid for through Medicare's Hospital Insurance program.

3. Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries." Each beneficiary was given a Medicare identification number, referred to as a Health Insurance Claim Number (HICN).

4. Home health care companies, pharmacies, physicians, and other health care providers that provide services to Medicare beneficiaries are referred to as "providers." To participate in Medicare, a provider was required to submit an application in which the provider agrees to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, the health care provider could file claims with a Medicare National Provider Indentification (NPI) number to obtain reimbursement from Medicare for medically necessary services rendered to beneficiaries.

## Home Health Services

5. The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if the patient:

   a. Was confined to the home, also referred to as homebound.

   b. Was under the care of a physician who specifically determined there was a need for home health care and established a Plan of Care; and

   c. The determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing, physical therapy, speech therapy, or continued need for occupational therapy, the beneficiary was confined to the home, that a Plan of Care for furnishing services was established and periodically

reviewed, and that the services were furnished while the beneficiary was under the care of the physician who established the Plan of Care.

6. Effective April 1, 2011, CMS initiated a new requirement for Medicare beneficiaries who are admitted for home health services. Prior to admission, or within 30 days following admission, the certifying physician must see the beneficiary "face-to-face" and document the encounter on a certification form that is provided to the agency. The agency must have this completed form on file prior to submitting a claim for the period.

7. Per 42 CFR § 424.22, the following documentation requirements must be met:
   a. The documentation must include the date when the physician, or an allowed non-physician practitioner (NPP) within the same practice, saw the patient;
   b. The documentation must include a brief narrative composed by the certifying physician that describes:
      i. The patient's clinical condition during the encounter;
      ii. How the patient's clinical condition supports his/her homebound status;
      iii. How the patient's clinical conditions supports his/her need for skilled services; and
   c. The physician must sign and date the encounter.

8. To determine the proper level of care for a patient and ultimately the amount of payment a home health care agency will receive, Medicare required that home health care agencies perform a comprehensive assessment of the patient that accurately reflected the patient's current health and provided information to measure his or her progress. In making this assessment, home health care agencies are required to complete a form called the Outcome and Assessment Information Set (OASIS).

9. The OASIS information was then used to create a Plan of Care (CMS Form 485). The Plan of Care specified the frequency of home health visits and described the services to be provided to the patient. A physician had to sign the CMS Form 485, certifying that home health care was necessary and that he/she had approved the Plan of Care.

10. The provider's decision on whether care was reasonable and necessary was based on information provided on the OASIS forms and in the medical records concerning the unique medical condition of the individual beneficiary.

## Candid Home Health Company

11. Candid Home Health, Inc ("Candid") was a Texas corporation incorporated on or about April 2006, that did business in Harris County, purportedly providing home health care services to eligible Medicare beneficiaries. Candid Home Health was located in Houston, Texas.

## Direct Care Clinic, Inc.

12. Direct Care Clinic, Inc. ("Direct Care") was a Texas corporation incorporated on or about March 2011, that did business in Harris County, purportedly providing medical services to eligible Medicare beneficiaries. Direct Care was located in Houston, Texas.

13. From in or around March 2011 to in our around February 2013, Direct Care referred to Candid beneficiaries for home health services. As a result of these referrals from Direct Care, Medicare made payments to Candid in the approximate amount of $258,738.

## The Defendant

14. Defendant OAKEY CHIKERE ("CHIKERE") is the owner and operator of Direct Care that purportedly provided medical services in the Southern Division of Houston, Texas.

## COUNT 1

### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. §1349)

15. Paragraphs 1 through 14 of the General Allegations section of this Indictment are re-alleged and incorporated as though fully set forth herein.

16. From in or around March 2011, and continuing through in or around February 2013, in Houston Division of the Southern District of Texas, and elsewhere, the defendant

### OAKEY CHIKERE

did knowingly and willfully combine, conspire, confederate and agree with other persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1349, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24 (b) that is Medicare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services.

## Objects of the Conspiracy

17. It was the object of the conspiracy for the co-conspirators to unlawfully enrich themselves and/or others known and unknown by, among other things: (a) Paying and receiving re-numeration for patient referrals and physician signatures on Medicare forms; and (b) Submitting requests for anticipated payments and claims for home health services that were not medically necessary.

## Manner and Means of Conspiracy

The manner and means by which the defendant and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

18. Defendant CHIKERE obtained and thereafter maintained control of Direct Care by registering as the Director and Registered agent.

19. CHIKERE did submit enrollment applications to Medicare under the name of Direct Care Clinic, Inc., for the submission of claims for payment to Medicare.

20. CHIKERE obtained and thereafter maintained sole signature authority for a corporate bank account of Direct Care, International Bank of Commerce account number xxxxx2038.

21. CHIKERE recruited doctors to work for Direct Care by representing that they would be paid for certifying and re-certifying patients for home health care, regardless of whether the home health services were medically necessary.

22. CHIKERE or other employees of Direct Care were contacted by home health care agencies regarding certifications or re-certifications for home health. In order to receive

reimbursement for home health services, agencies must have a doctor certify that such services are medically necessary.

23. From on or about March 2011, and continuing through on or about February 2013, CHIKERE did business with Candid. Candid was owned by and registered to co-conspirator Ebelenwa Chudy-Onwuugaje ("Chudy"). Candid purportedly did business specializing in home health services in Houston, Texas.

24. From on or about March 2011, and continuing through on or about February 2013, CHIKERE would and did agree to get paid by Chudy for doctor signatures certifying home health for Candid beneficiaries when such medical services were not necessary. Specifically, Chudy made an agreement to pay CHIKERE $100 for Houston patients and $150 for patients outside of Houston for physician signatures on Medicare 485 forms.

25. Chudy acting with other un-indicted co-conspirators both known and unknown would and did pay Medicare beneficiaries to visit Direct Care clinic to obtain false medical documentation for home health services. In return, other un-indicted co-conspirators both known and unknown would be paid kickbacks by Chudy for referring beneficiaries.

26. Candid gave employees at Direct Care beneficiaries' names, Medicare numbers, address and other personal information for the certifications and re-certifications.

27. Unindicted co-conspirator M.M. was employed by CHIKERE at Direct Care from on or about May 2012 to on or about October 2012. M.M. was supervised by CHIKERE and purportedly examined beneficiaries at Direct Care and, at times, in the patient's homes.

28. At the direction of CHIKERE, M.M. interacted with each beneficiary that visited Direct Care, sometimes taking vital signs or inquiring about prescriptions. M.M. did not administer any medically necessary examinations or diagnostic tests. M.M.'s only

purpose in seeing the beneficiary was to document a face to face encounter required by Medicare to justify a referral to Candid for home health services. M.M. was not an allowed non-physician practitioner (NPP) to document face-to-face encounters with the patients for home health services.

29. After establishing the false documentation on the solicited Candid beneficiaries, Direct Care clinic would refer the beneficiaries to Candid for home health services; regardless of whether the beneficiaries needed the services.

30. Chudy would and did send the OASIS forms back to Direct Care where un-indicted co-conspirators L.Z. and A.F., physicians employed by CHIKERE, would certify patients for home health when the patients were not under the care of the physician, had not been seen by the physicians, and were not in need of home health services.

31. As a result of these fraudulent referrals by Direct Care to Candid, CHIKERE submitted, or caused to be submitted fraudulent claims to Medicare. Medicare made payments to Candid in the approximate amount of $258,738 . Those payments were deposited into Candid's corporate bank account, Wells Fargo Bank Account xxxxxx6001.

32. Defendant CHIKERE, Chudy and other un-indicted co-conspirators both known and unknown used proceeds of the Medicare fraud to pay unlawful kickbacks, pay other operating expenses, and enrich themselves.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-5
## Health Care Fraud
## (18 U.S.C. § 1347)

33. Paragraph 1 through 14 of the General Allegations section of this Indictment are re-alleged and incorporated as though fully set forth herein.

34. From in or around March 2011, and continuing through in or around February 2013, in Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**OAKEY CHIKERE**

aided and abetted by others known and unknown, in connection with the delivery of and payment for health care benefits, items and services , did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program affecting commerce, as defined by Title 18, United States code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by , and under the custody and control of Medicare, that is, the defendant, through Direct Care Clinic Inc., by certifying beneficiaries to Candid for home health services,  caused the submission of, false and fraudulent claims to Medicare.

Purpose of the Scheme and Artifice

35. It was the purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things: (a) by fraudulently inducing Medicare to pay reimbursements for purportedly legitimate home health care claims, which claims  the defendant knew to be false, fictitious, fraudulent and otherwise non-

9

reimbursable in that, as the defendant well knew, the services billed were provided to persons who the defendant knew were not qualified to receive Medicare home health care benefits; (b) concealing the submission of false and fraudulent claims to Medicare and receipt and transfer of fraud proceeds; and (c) diverting fraud proceeds for the personal use and benefit of themselves and others.

## The Scheme and Artifice

36. The allegations in paragraphs 18-32 of the Manner and Means sections of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## Execution of the Scheme and Artifice to Defraud

37. On or about the dates set forth as to each count below, in Houston Division of the Southern District of Texas, and elsewhere, OAKEY CHIKERE, did knowingly and willfully execute a scheme to defraud a health care benefit program and to obtain by means of material, false and fraudulent pretenses, representations and promises, any of the money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items and services, to wit: on or about the listed dates, the defendant caused to be submitted false, forged, and fraudulent claims to Medicare for home health services that were not medically necessary.

| Count | Medicare Beneficiary | Approx. Date of Services | Services Billed | Approx. Amount Paid |
|---|---|---|---|---|
| 2 | J.A. | 3/27/2012 thru | Home Health | $6,644.00 |

| | | | | |
|---|---|---|---|---|
| | | 8/26/2012 | | |
| 3 | E.S | 6/8/2012 thru 6/30/12 | Home Health | $5,274.00 |
| 4 | L.R. | 6/20/12 thru 8/6/12 | Home Health | $4,467.00 |
| 5 | A.S. | 6/6/2012 Thru 2/20/2013 | Home Health | $9,048.00 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF CRIMINAL FORFEITURE
(18 U.S.C. §§ 982(a)(7))

38. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendant, OAKEY CHIKERE, that, in the event of conviction for any of the violations charged in Counts One through Five of the Indictment, the United States intends to forfeit all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of any such offense, including but not limited to, a money judgment in the amount of at least $258,738 in United States currency.

39. In the event that the property subject to forfeiture as a result of any act or omission of a defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

A TRUE BILL:

Original Signature on File

KENNETH MAGIDSON
UNITED STATES ATTORNEY

_____
TINA ANSARI
ASSISTANT UNITED STATES ATTORNEY